AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of )<br>information associated with SNAPCHAT USERNAMES )<br>STACIEJAXX1,STACEY_JAXX2020,KXILEYWXRNC )<br>KE & JNR_JADEN THAT ARE STORED AT PREMISES )<br>CONTROLLED BY SNAPCHAT, INC. (See Attachment A.) ) | 4:20 MJ 8048 SRW<br>**FILED UNDER SEAL**<br>SIGNED AND SUBMITTED TO THE COURT FOR<br>FILING BY RELIABLE ELECTRONIC MEANS |

## APPLICATION FOR A SEARCH WARRANT

I,  __AMY MEYER__  , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

### See Attachment A

located in the _____ District of ___California___ , there is now concealed

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
        XX evidence of a crime;
        XX contraband, fruits of crime, or other items illegally possessed;
        XX property designed for use, intended for use, or used in committing a crime;
        a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title   Section | |

18 U.S.C. § 1591 (Sex Trafficking of a Child) and 18 U.S.C. § 2422 (Enticement and Coercion of a Minor)

The application is based on these facts:

    SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

      ✓    Continued on the attached sheet.
      ❑    Delayed notice of days (give exact ending date if more than 30 days:) is requested under 18
U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the foregoing is true and correct.

                                           *Applicant's signature*
                                       Amy Meyer, TFO, FBI
                                       *Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of
Criminal Procedure 4.1 and 41.

Date:  _____09-18-2020_____ 11:52 AM   _____
                                                       *Judge's signature*

City and State:  ___St. Louis, MO___   ___Honorable Stephen R. Welby, U.S. Magistrate Judge___
                                             *Printed name and title*
                                    AUSA:   Jillian Anderson

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| INFORMATION ASSOCIATED WITH | ) | No. 4:20  MJ 8048 SRW |
| SNAPCHAT USERNAMES | ) | **FILED UNDER SEAL** |
| STACIEJAXX1, STACEY_JAXX2020, | | |
| KXILEYWXRNCKE & JNR_JADEN THAT | SIGNED AND SUBMITTED TO THE | |
| ARE STORED AT PREMISES | COURT FOR FILING BY RELIABLE | |
| CONTROLLED BY SNAPCHAT, INC. | ELECTRONIC MEANS) | |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Amy Meyer, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) and Federal Criminal Procedure 41 for information associated with "staciejaxx1," "stacey_jaxx2020," "kxileywxrncke" and "jnr_jaden" (the "subject accounts") that are stored at premises owned, maintained, controlled, or operated by Snapchat, Inc., ("Snapchat") a social-networking company headquartered in Venice, California. The information to be searched is described in the following paragraphs and in Attachment A. The requested warrant would require Snapchat to disclose to the United States records and other information in its possession, including the contents of communications, pertaining to the subscriber or customer associated with the subject account as further described in Attachment B.

2.     I am a Task Force Agent with the Federal Bureau of investigation. I have been employed as a police officer for approximately eighteen (18) years and am currently assigned to the St. Louis County Police Department ("SLCPD") Special Investigations Unit.  I have worked a variety of investigations to include prostitution, sex trafficking, sex trafficking of a child, possession of child pornography and production of child pornography. During my time as a law

enforcement officer, I have utilized a variety of investigative techniques to include: organizing and participating in physical surveillance; participating in undercover operations; serving search warrants; making arrests; and interviews involving defendants. As part of my duties as a Detective / Task Force Officer, I investigate crimes involving sex trafficking and child pornography, including violations of Title 18, United States Code, Section 1591 (sex trafficking of children or by force, fraud, or coercion); Title 18, United States Code, Sections 2422(a) and 2422(b) (coercion and enticement to engage in prostitution); Title 18, United States Code, Sections 2251(a) and 2251(e) (production and attempted production of child pornography).  I have received specialized training in the area of sex trafficking, and have participated in investigations of persons suspected of violating federal sex trafficking laws, including Title 18, United States Code, Sections 1591, 1952, 2422, 2422 and 2423.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1591 (Sex Trafficking of a Child) and 18 U.S.C. § 2422 (Enticement and Coercion of a Minor), have been committed by Thomas J. Bowles. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## LOCATION TO BE SEARCHED

5.     The location to be searched is:

2

"staciejaxx1," "stacey_jaxx2020," "kxileywxrncke" and "jnr_jaden" (hereinafter referred to as "Subject Accounts") located at 63 Market Street, Venice, CA  90291, further described in Attachment A.  The items to be reviewed and seized by the United States are described in Attachment Part II of Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO SNAPCHAT

7.      The Internet is in part a computer communications network using interstate and foreign telephone and communication lines to transmit data streams, including data streams used to provide a means of communication from one computer to another and used to store, transfer and receive data and image files.

8.      An "Internet Protocol" (IP) address is a unique series of numbers, separated by a period, that identifies each computer using, or connected to, the Internet over a network.  An IP address permits a computer (or other digital device) to communicate with other devices via the Internet.  The IP addresses aids in identifying the location of digital devices that are connected to the Internet so that they can be differentiated from other devices.  As a mailing address allows a sender to mail a letter, a remote computer uses an IP address to communicate with other computers.

9.      An "Internet Service Provider" (ISP) is an entity that provides access to the Internet to its subscribers.

3

10.     The term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

11.     Snapchat is a mobile application made by Snap Inc. and available through the iPhone App Store and Google Play.  The application provides a way to share moments with photos, videos, and text.  A user takes a photo or video using their camera phone in real-time and then selects which of their friends to send the message to.  Unless the sender or recipient opts to save the photo or video, the message will be deleted from their devices (after the content is sent in the case of the sender and after it is opened in the case of the recipient). Users are able to save a photo or video they've taken locally to their device or to Memories, which is Snapchat's cloud-storage service.

12.     Stories: A user can add a photo or video Snaps to their "Story." Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchatters or just the user's friends for up to 24 hours. Stories can also be saved in Memories.

13.     Memories: Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories.  A user can also edit and send Snaps and create Stories from these Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by us and may remain in Memories until deleted by the user.

14.     Chat: A user can also type messages, send photos, videos, audio notes, and video notes to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the

Chat by tapping on the message that they want to keep. The user can clear the message by tapping it again.

15.     Upon creating a Snapchat account, a Snapchat user must create a unique Snapchat username and an account password. This information is collected and maintained by Snapchat. A Snapchat username is a unique identifier associated with a specific user on Snapchat, and cannot be changed by the user. On the other hand, a Snapchat vanity name is not a unique identifier and can be set and changed by a user or that user's friends to indicate how the user will appear within the app. Unlike a username, a vanity name can contain special characters and symbols beyond hyphen, underscore, or period, as well as spaces, emojis, and capital letters.

16.     Snapchat asks users to provide basic identity and contact information upon registration. Basic subscriber information is collected when a user creates a new Snapchat account, alters information at a later date, or otherwise interacts with the Service. Basic subscriber information may include: Snapchat username; Email address; Phone number; Snapchat user vanity name; Snapchat account creation date and IP address; Timestamp and IP address of account logins and logouts.

17.     Snapchat retains logs for the last 31 days of Snaps sent and received, for 24 hours of posted Stories, and for any unopened Chats or those saved by a sender or recipient. The logs contain meta-data about the Snaps, Stories, and Chats, but not the content.

18.     As explained herein, information stored in connection with a Snapchat account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Snapchat user's account activity, IP log, stored electronic communications, and other data

retained by Snapchat, can indicate who has used or controlled the Snapchat account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Snapchat account at a relevant time. Further, Snapchat account activity can show how and when the account was accessed or used. For example, as described herein, Snapchat logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Snapchat access, use, and events relating to the crime under investigation. Additionally, Snapchat builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Snapchat "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Snapchat account owner. Last, Snapchat account activity may provide relevant insight into the Snapchat account owner's state of mind as it relates to the offense under investigation. For example, information on the Snapchat account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

19. Based on the information above, the computers of Snapchat are likely to contain all the material described above with respect to the SUBJECT ACCOUNT, including stored electronic communications and information concerning subscribers and their use of Snapchat,

such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

## PROBABLE CAUSE

20.     In July of 2020, Sergeant Adam Kavanaugh, DSN 2877, of the St. Louis County Police Department's Special Investigations Unit, advised this affiant that on July 20th, 2020 he had been contacted by the Jefferson County Sheriff's Department regarding an incident involving a suspected registered sexual offender possibly attempting to solicit a 16 year old female for the purposes of sexual material or acts.  Sgt. Kavanaugh subsequently directed this affiant to review Jefferson County Sheriff's Offense Investigative Report #20-23994 for further information regarding the incident.

21.     As directed, this affiant proceeded to review Jefferson County Sheriff's Department Offense Investigative Report #20-23994, during which time this affiant noted that on July 20th, 2020, a Jefferson County Sheriff's Deputy, Deputy Cope, DSN 139, received a call for service at the residence located on Marble Springs Rd. in Barnhart, MO 63012.  The call for service was requested in regards to the discovery of a suspicious unaddressed envelope containing a handwritten letter and a vape package, which had been discovered within the home's mailbox.

22.     Upon arriving at the residence, Deputy Cope spoke with an adult female resident, identified as T.W., who stated that earlier on July 20th, 2020, she and her boyfriend, identified as N.V., discovered the unaddressed envelope inside the mailbox of their shared residence.  T.W. further stated that upon retrieving the envelope from the mailbox, she observed written upon its exterior her 16-year-old juvenile granddaughter's, K.W.'s, name.  T.W. further advised she

7

subsequently opened the envelope, at which time she discovered a handwritten letter, the contents of which advised K.W. that the author of the letter, who referred to himself as '"Daddy TJ", had recently damaged his phone, causing him to lose all of his contact information to include K.W.'s phone number and Snapchat account information.  "Daddy TJ" also wrote in the letter he had included a package of BIDI vape sticks he had previously promised to provide to K.W., and further wrote that he possessed additional vaping items and a bucket of Fireball brand airport-sized alcohol bottles, all of which he intended to provide to K.W. at a later time.  "Daddy TJ" lastly requested K.W. to call or text him at the phone number of (636) 233-4759 or contact him via his Snapchat account, which he identified as having the username of "stacey-jaxx2020" with the profile name of "Stacy Rosa."

23.     After interviewing T.W. and N.V., Deputy Cope proceeded to conduct a computer investigation of the phone number of (636) 233-4759, which was the phone number at which "TJ" had directed K.W. to contact him.  The results of the computer inquiry revealed that a convicted Tier 3 sex offender with previous convictions for Statutory Rape 2nd Degree, Statutory Sodomy 2nd Degree, Abuse of a Child, and Invasion of Privacy, was linked to the phone number. This individual was subsequently identified as Thomas J. Bowles (DOB 3/14/1976).

24.     Following the computer investigation regarding the above-referenced phone number, Deputy Cope continued to speak with T.W. and N.V.  During this time, T.W. advised K.W. had resided at T.W.'s residence, but had recently been moved to another relative's home where K.W. was now presently residing.  T.W. subsequently provided Deputy Cope with K.W.'s current address, as well as identified the relative with whom K.W. was now residing as K.W.'s grandfather, D.W.

25.     Subsequent to this affiant's review of the Jefferson County Sheriff's Department's Offense Incident Report, this affiant conducted a computer investigation of Thomas J. Bowles, the results of which indicated Thomas Bowles was a registered sex offender with the Missouri Highway Patrol for the conviction of 17 sexual offenses, 3 child abuse offenses, and 2 invasion of privacy offenses, all of which appeared to have been committed upon female children between the ages of 14 to 16 years of age.  Additionally, upon acquiring Thomas Bowles's most recent sex offender registration information submitted on August 6th, 2020, this affiant noted that Thomas J. Bowles had not listed or provided any online identifiers, email addresses, or social media accounts he had established, possessed, and/or utilized, which he is required to do as part of his sex offender registration.  This affiant lastly observed numerous photographs for Thomas J. Bowles, which had been uploaded to the Missouri Highway Patrol's sex offender registration website.

26.     As this affiant continued to investigate Thomas Bowles, this affiant noted, that per the Missouri Department of Revenue, Thomas Bowles's full name was Thomas Joseph Bowles. As such, his first and middle initials were "T" and "J" respectively, which, when combined, created the moniker "TJ," which was the name the author of the letter provided for himself, further indicating Thomas Bowles was the individual who wrote the letter intended for K.W.

27.     Continued investigation into Thomas Bowles revealed that in both February of 2017 and June of 2020, he was investigated by the St. Charles County Police Department regarding his failure to register required information as part of his registration as a sex offender with the Missouri Highway Patrol.  As such, this affiant reasonably concluded Thomas J. Bowles had been made repeatedly aware of the mandate he register all requested information included on

9

the sex offender forms he submitted as part of his registration, to include the provision of all the social media and online accounts he had established, possessed, and/or utilized.

28.     In addition to conducting the computer investigation regarding Thomas J. Bowles, this affiant also contacted T.W. via the phone.  Upon speaking with her, T.W. reiterated the statements she had previously provided to Deputy Cope.  Additionally, T.W. also provided this affiant with the contact information for the relatives with whom K.W. was presently residing, D.W. and L.W.

29.     Upon receiving D.W. and L.W.'s contact information, this affiant contacted L.W. via the phone.  Upon speaking with her, L.W. and this affiant arranged for this affiant to meet with and interview K.W. on August 12th, 2020 at L.W. and D.W.'s residence.

30.     As arranged, on August 12th, 2020, this affiant, along with Detective Scott Woodward, DSN 275A, of the St. Louis County Police Department's Special Investigations Unit, responded to the L.W. and D.W.'s residence.  Upon arriving there, Det. Woodward and this affiant met with and interviewed K.W. who stated that since she was approximately 12 or 13 years old, an individual she knew primarily as "Stacy," "Stacy Jaxx" and "Stacy Rosa" had repeatedly contacted her via multiple social media platforms to include Facebook, Messenger, Instagram, and Snapchat, as well as via phone-based text messaging and voicemails.  K.W. stated that during these communications, "Stacy" had advised her that he would like to become her "sugar daddy," which is a term commonly used to refer to a wealthy older man who spends freely on a younger person, generally a woman or a gay man, in return for sexual intimacy.  She further added that "Stacy" had offered to provide her with currency,  a "cash out" account (similar to Venmo), and clothing, all of which he would provide to her in exchange for K.W.

engaging in various sexual acts with him to include oral and anal sexual intercourse, as well as

with providing him with nude images of herself.  K.W. provided law enforcement with the

information that during her communications with "Stacy" her Facebook username was

"kailey.warncke.52" and her Snapchat username was "kxileywerncke." Upon interviewing K.W.

and J.R. and reviewing their social media profiles it was determined that "Stacey's" Facebook

username was "tommy.joesph.31" and his Snapchat username was "staciejaxx1" and

"stacey_jaxx2020."

31.     As Detective Woodward and this affiant continued to interview her, K.W. advised

"Stacy" had informed her that he was associated with another juvenile female from K.W.'s

former school, DeSoto High School, who had an arrangement with "Stacy."  K.W. further

advised "Stacy" claimed he provided this other juvenile female with U.S. currency and alcohol in

exchange for the juvenile female performing oral sexual intercourse upon him.  K.W.

subsequently identified the juvenile female as J.R.  K.W. then asserted she had communicated

online with J.R. about J.R.'s association and interaction with "Stacy," during which time J.R.

confirmed she had such an arrangement with "Stacy."

32.     As K.W., Det. Woodward and this affiant continued the discussion regarding

"Stacy", K.W. advised she believed "Stacy" owned or drove a neon green Ford Mustang due to

the fact he had sent her several images of the vehicle and even offered to provide it to her.  She

also recalled "Stacy" possessed a Facebook account with a profile name of "Tommy Joseph",

which she subsequently accessed and displayed to Det. Woodward and this affiant via her smart

cellular phone.  Upon viewing this Facebook account, which was located at the URL of

"https://www.facebook.com/tommy.joesph.31", this affiant observed multiple images of a white

male whom this affiant immediately recognized as the same middle-aged white male with brown

11

hair displayed in the images this affiant had previously seen of Thomas J. Bowles via both his registered Missouri driver's license photograph, as well as via the numerous photographs on file with his Missouri State Highway Patrol Sex Offender Registry information.   As such, this affiant positively identified the individual known by K.W. as "Stacy" to be Thomas Joseph Bowles.  Additionally, as K.W. scrolled through the timeline information for Thomas Bowles's Facebook account, this affiant observed video footage of a neon green Ford Mustang uploaded to the account, further substantiating the identifying information K.W. provided for Thomas Bowles.

33.     After concluding "Stacy" and Thomas Bowles were the same individuals, this affiant requested K.W.'s consent to search the digital contents of her personal cellular phone, as well as to access and assume her online identity via her Facebook and Messenger accounts. K.W. subsequently provided her consent to this affiant's requests, at which time she completed both a St. Louis County Police Department Consent to Search Digital Data Devices form and a St. Louis County Police Department Consent to Access Online Accounts/Assume Online Identity form.  Upon her completion of the forms, this affiant seized her phone, the digital data devices form, and the online accounts form as Evidence Items #KW1, KW2, and KW3, respectively.

34.     On August 18th, 2020, this affiant was contacted via the phone by T.W. who reported another unaddressed envelope had been discovered inside her residence's mailbox. This affiant responded to T.W.'s residence and met with T.W.  Upon meeting with her, T.W. stated she had discovered the letter in the mailbox, removed it, and placed it within the home. T.W. added that based upon her initial observations of the envelope, it appeared to be similar to the envelope previously discovered in her mailbox on July 20th, 2020.  Additionally, T.W. further

stated that the handwritten name of "K.W." displayed upon the envelope's exterior appeared to be similar to the handwriting displayed upon the previous envelope.

35.     Following T.W.'s statements, this affiant proceeded to photograph the envelope prior to opening it with the utilization of medical gloves.  While photographing the envelope, this affiant observed that K.W.'s name was solely written upon the envelope's exterior, again substantiating that whomever had prepared the enveloped and its contents had most likely driven to T.W.'s residence and personally placed it into the residence's mailbox.

36.     Once this affiant had completed photographing the envelope's exterior, this affiant opened the envelope with a cutting device and removed a single sheet of paper and a packaged vape stick from within.  After removing the items, this affiant observed the sheet of paper had handwritten upon it the following script:

"K.W.,

Contact me (TEXT) at (636) 233-4759, I got stuff for you."

37.     From August 18th, 2020 to August 20th, 2020, this affiant initiated and engaged in an undercover message exchange via K.W.'s Messenger account with Thomas Bowles's "Tommy Joseph" Messenger account.  During this message exchange, Thomas Bowles made the following statements:

*"I'll even buy u a new phone"*

*"Just keep it hidden and on the DL"*

(It should be noted, "DL" is a common online or textual acronym for "Down Low" meaning to maintain a low profile)

*"Look, I just like u, that's all and I thought u were down with a 'provider ship type of senario'"*

*"Yeah so just say the word and I'll get u a iPhone 7"*

*"That's where a more mature guy can step in and I think I've been good to u thus far"*

*"Did u get those two vapes I sent u a couple weeks ago in the yellow envelope??"*

*"U really don't need to be, I think we would get along fine once u see how laid back I am and what I can do for u"*

*"I'm on dom in the bedroom"*

(It should be noted, "dom" is a common online or textual abbreviation for the term "dominant," which refers to the <u>dominant</u> person in a "BDSM" relationship. Additionally, "BDSM" is an <u>overlapping</u> abbreviation for a Bondage and Discipline (BD), Dominance and Submission (DS) , Sadism and Masochism (SM) relationship or encounter.)

*"U already have another SD or summin??"*

(It should be noted, "SD" is a common online or textual acronym for the term "sugar daddy.")

*"I just remember u saying  u wouldn't mind a ligit sd as old as 55 or summin like that and I'm way younger then that so I just though we would jibe well"*

*"If we work out well I could even get u a car"*

*"Trust me (K.W.'s name), I know ur new to this but I'll go slow and walk u through, I make it so you will NOT have any regret s"*

38.     Following these messages from Thomas J. Bowles, this affiant inquired under the guise of K.W.'s identity for specification regarding the actual parameters of the "SD" relationship Thomas Bowles sought to establish with K.W. in terms of what form of benefits she could expect to receive as part of her participation in this type of relationship, as well as what acts or behaviors Thomas J. Bowles expected K.W. to engage in exchange for those benefits.  In response, Thomas J. Bowles answered:

*"We should talk*

14

*Not text"*

39.     In response to Thomas Bowles's refusal to discuss online the parameters of the "SD" relationship he sought to have with K.W., this affiant reasonably concluded Thomas J. Bowles was utilizing a common tactic online child sexual predators use as part of their effort to thwart any law enforcement personnel from detecting and/or digitally documenting their attempts to sexually exploit a child.  Based upon this conclusion, as well as Thomas Bowles's refusal to elaborate upon the boundaries of the "SD" relationship he was seeking without actual audible/vocal conversation occurring between him and K.W., this affiant arranged under the guise of K.W.'s identity to meet with Thomas Bowles at approximately 2300 hours on August 20th, 2020.

40.     Additionally, while this affiant was engaging in the undercover message exchange with Thomas J. Bowles, this affiant contacted K.W. via the phone in order to confirm that the individual whom she knew as "Stacy" (a.k.a. Thomas Bowles) was aware of her age and, therefore, juvenile status.  K.W. subsequently confirmed "Stacy" had always been aware of her age.  She further explained that from the ages of 12 to 16 years, she repeatedly advised "Stacy" of her age whenever he attempted to communicate with her and/or requested to meet with her, requested to engage in sexual activity with her, and/or requested nude images of her.

41.     Following the arrangement of the intended meeting with Thomas J. Bowles, and on August 20th, 2020, this affiant prepared a St. Charles County search warrant for Thomas J. Bowles's residence located at 1133 Talbridge Way in St. Charles, MO 63303.  The search warrant was subsequently presented to and granted by the Honorable Judge Rebecca Navarro-McKelvey of the Circuit Court of the County of St. Charles in the State of Missouri.

42.     Then, later on August 20th, 2020, and upon the acquisition of the search warrant,

members of the St. Charles City Police Department's Tactical Operations Unit executed the warrant at the residence located at 1133 Talbridge Way in St. Charles, MO 63303.

43.     Upon executing the warrant, members of the unit encountered residents, including Thomas J. Bowles, within the home.   Some of the members of the Tactical Operations Unit subsequently secured Thomas J. Bowles with the application of handcuffs and escorted him from the home and into the custody of St. Charles City law enforcement officials who subsequently conveyed him to the St. Charles City Jail located at 1781 Zumbehl Rd. in St. Charles, MO 63303.

44.     Then, on August 21st, 2020, Sgt. Kavanaugh contacted the juvenile female purportedly having engaged in sexual contact with Thomas Bowles per K.W.'s statements.  This juvenile female is identified as 17-year-old J.R.

45.     Upon speaking with her, J.R. confirmed she had been contacted by Thomas J. Bowles via social media.  She reported she had been initially contacted by Thomas Bowles via her Snapchat account registered with the Username of "JNR_Jaden".  J.R. further stated Thomas Bowles had contacted her via his Snapchat account, which she subsequently identified as having the username of "Stacey_Jaxx2020."   It was further determined in the investigations that J.R. utilized a Facebook user name "Jaden1Richardson."

46.     J.R. reported she initially "blocked" Thomas J. Bowles from contacting her online due to the uncomfortable feeling he caused to arise in her, as well as her belief he was "stalking" her.  This uncomfortable feeling and belief of being stalked stemmed from Thomas J. Bowles insistence that he become J.R.'s "sugar daddy," a term which J.R. understood as meaning a male who would buy a female gifts and/or provide her with money in exchange for "company."  Upon inquiry, J.R. stated she interpreted the concept of the "company" the male was to receive from

the female as the female's participation in sexual conduct.

47.     Sgt. Kavanaugh subsequently presented J.R. with a digital photograph line-up, at which time J.R. positively identified Thomas Bowles's photograph.

48.     J.R. reported she had met in-person with Thomas Bowles on two occasions, both of which occurred when she was 16 years of age.  She further reported Thomas J. Bowles was aware of her juvenile status and age at the times they met.

49.     J.R. stated that during the first occasion when she met in-person with Thomas Bowles, she met him inside a vehicle he was driving.  Upon meeting with him, Thomas Bowles provided J.R. with $300 in currency, "Fireball" brand liquor, and "Hennessey" brand liquor. Additionally, while they were both in the vehicle, Thomas Bowles drove the vehicle as he simultaneously rubbed J.R.'s upper thigh near her vaginal area.  J.R. reported that the act of Thomas Bowles's rubbing her upper thigh near her vagina caused her to become nervous because she suspected Thomas Bowles expected J.R. to perform oral sex upon his penis and/or engage in sexual intercourse with him.  J.R. stated, however, that during this occasion she did not engage in either sexual act with Thomas Bowles.

50.     J.R. next described the second encounter between her and Thomas Bowles. During this encounter, Thomas Bowles proceeded to drive both J.R. and himself to a LaQuinta Hotel located in the Festus, MO area.  After acquiring a hotel room, J.R. performed oral sexual intercourse upon Thomas Bowles's penis, in exchange for which Thomas Bowles provided J.R. with $500 in currency, as well as additional "Fireball" brand liquor.  J.R. subsequently estimated this last encounter occurred a few months prior to Sgt. Kavanaugh's interview with her.

51.     Following the interview with J.R., Sgt. Kavanaugh responded to the LaQuinta Hotel located at 1001 Veterans Blvd. in Festus, MO.  Upon arriving at the hotel, Sgt. Kavanaugh

met with the hotel manager, identified as Tamara Martin.  Upon speaking with her, Tamara Martin accessed the hotel's computer and retrieved Thomas Bowles's room reservation/rental for May 31st, 2020.  While engaged in this task, Tamara Martin inquired as to whether Sgt. Kavanaugh's inquiries into Thomas J. Bowles's room reservation pertained to J.R., to which Sgt. Kavanaugh confirmed it did.  In response, Tamara Martin remarked that she had been working on May 31st, 2020 when Thomas J. Bowles rented the room.  She further remarked that while checking Thomas J. Bowles into the room, Thomas J. Bowles requested J.R. be provided with her own room key.  As such, Tamara Martin inserted this specific request into the commentary section of the hotel's online room reservation database for Thomas J. Bowles's room rental.

52.     While Tamara Martin was providing Sgt. Kavanaugh with the hard-copy and authorizing Sgt. Kavanaugh to photograph the hotel's computer screen, Tamara Martin reported that upon observing J.R.'s appearance on the day of the room's rental, Tamara Martin assessed J.R. to be "underage."

53.     Following the interview with Tamara Martin, Sgt. Kavanaugh compared J.R.'s date of birth to the date of the room rental at the LaQuinta Hotel.  Upon comparing these dates, Sgt. Kavanaugh confirmed J.R. was only 16 years of age at the time.

54.     A background check revealed that Thomas J. Bowles was convicted on or about October 25, 2002, in a case involving multiple victims, of twelve counts of statutory rape in the second degree, five counts of statutory sodomy in the second degree, three counts of abuse of a child and three counts of invasion of privacy in the Circuit Court for St. Louis County and was sentenced to a total of sixteen years in prison. The record check also indicated that Thomas J. Bowles was convicted of harassment on or about October 25, 2002, in the Circuit Court for St. Louis County and was sentenced to one year in jail; was convicted of making a false bomb threat

18

on or about October 25, 2002, in the Circuit Court for St. Louis County and was sentenced to five years in prison; was convicted of assault in the second degree and armed criminal action on or about October 16, 2012, in the Circuit Court for St. Charles County, and has charges of felony harassment and making a false report pending in the Circuit Court of St. Charles County.

55.    A preservation letter was sent to Snapchat regarding the "staciejaxx1," "stacey_jaxx2020," "kxileywxrncke" and "jnr_jaden" Snapchat profiles and accounts.

56.    Based on my experience and training, individuals who engage in criminal activity, including violation of 18 U.S.C. § 1591 (Sex Trafficking of a Child), 18 U.S.C. § 2422 (Enticement and Coercion of a Minor), and other crimes against children of a sexual nature often utilize text messaging, social media, other means of cellular telephone and online communication, and electronic devices capable of accessing the internet to meet children, to communicate with children, to exchange information/communication regarding details relevant to criminal activity, locate children using GPS technology and to receive and distribute images and/or videos relevant to criminal activity involving children.

57.    Based on the foregoing, I believe there is probable cause to conclude that Thomas J. Bowles has violated 18 U.S.C. § 1591 (Sex Trafficking of a Child) and 18 U.S.C. § 2422 (Enticement and Coercion of a Minor), for which he was indicted on or about September 3, 2020, and that evidence of such crimes is contained in the information and data associated with the Snapchat profiles with usernames "staciejaxx1," "stacey_jaxx2020," "kxileywxrncke" and "jnr_jaden."

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

58.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A), by

using the warrant to require Snapchat to disclose to the United States copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, United States-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

59.     Based on the forgoing, I request that the Court issue the proposed search warrant. The United States will execute this warrant by serving the warrant on Snapchat. Because the warrant will be served on Snapchat, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

60.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

61.     I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

I state under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Amy Meyer
Task Force Agent
Federal Bureau of Investigation

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on the ___18th___, September, 2020.   AT 11:52AM

STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

21

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook accounts and/or user

IDs:

"tommy.joesph.31," "kailey.warncke.52" and "jaden1richardson"

that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., located

at 1601 Willow Road, Menlo Park, CA  94025.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook, Inc. is required to disclose, from January 1, 2020 to August 31, 2020, the following information to the United States for each account listed in Attachment A:

(a) All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content;

(b) All location data associated with the account created, uploaded, or shared by the account;

(c) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All past and current usernames associated with the account;

(f) All records of Facebook searches performed by the account, including all past searches saved by the account;

(g) All activity logs for the account and all other documents showing the user's posts and other Facebook, Inc. activities;

(h) All photos and videos uploaded by that account and user ID and all photos and videos uploaded by any user, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(i) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that account and user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(j) All IP logs, including all records of the IP addresses that logged into the account;

(k) The types of service utilized by the user;

(l) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(m) All privacy settings and other account settings, including privacy settings for individual posts and activities, and all records showing which Facebook users have been blocked by the account;

(n) A list of all of the people that the user follows on Facebook and all people who are following the user (*i.e.*, the user's "following" list and "followers" list), as well as any friends of the user;

(o) A list of all users that the account has "unfollowed" or blocked;

2

(p) All privacy and account settings;

(q) All information about connections between the account and third-party websites and applications; and,

(r) All records pertaining to communications between Facebook, Inc. and any person regarding the user or the user's Facebook account, including contacts with support services, and all records of actions taken, including suspensions of the account.

(s) Any and all cookies associated with or used by any computer or web browser associated with the account, including the IP addresses, dates, and times associated with the recognition of any such cookie;

Facebook, Inc. is hereby ordered to disclose the above information to the United States within 14 days of the date of this warrant.

## II.    Information to be seized by the United States

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §1591 or 18 U.S.C. § 2422  involving Thomas J. Bowles including, for each account or user ID identified on Attachment A, information pertaining to the following matters:

(a) Any information or records reflecting other minors presently unidentified who may have been victims of or witnesses to criminal activity involving Thomas J. Bowles of a sexual nature;

(b) Any evidence that indicates the account holder's state of mind as it relates to the crimes under investigation;

3

(c) All records, files, images, text and communications exchanged between Thomas J. Bowles, K.W. and J.R., and users of the profiles/user IDs "tommy.joesph.31," "kailey.warncke.52" and "jaden1richardson."

(d) All records, data and communications concerning actual or attempted communication by Thomas J. Bowles with minors with the intent to engage in unlawful sexual activity.

(e) Evidence indicating how and when user's account was accessed to determine the chronological context of account use, account access, and events relating to the crime under investigation;

(f) Evidence indicating the account user's state of mind as it relates to the crimes under investigation;

(g) The identity of the person(s) who created the account, including records that help reveal the whereabouts of such person(s).

(h) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(i) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(j) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(k) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any United States personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the United States, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the United States and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, Inc., and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook, Inc.. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, Inc., and they were made by Facebook, Inc. as a regular practice; and

b.      such records were generated by Facebook, Inc.'s electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook, Inc. in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, Inc., and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                             Signature

2